# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | |
|---|---|
| United States of America, | Case No. 23-cr-177 (WMW/ECW) |
| Plaintiff, | |
| v. | **REPORT AND RECOMMENDATION** |
| Saul Rodriguez Pineda, | |
| Defendant. | |

Defendant Saul Rodriguez Pineda filed a Motion to Suppress All Evidence Obtained from Unlawful Searches and Seizures.  (Dkt. 16 ("the Motion").)  The Court held a hearing on the Motion on July 19, 2023 (Dkt. 22); a reopened hearing on October 4, 2023 (Dkt. 29), and a continued reopened hearing on October 6, 2023 ("the October 6 reopened hearing").  Matthew Forbes, Assistant United States Attorney, appeared on behalf of the United States of America ("the Government") and Daniel Gerdts appeared on behalf of Pineda.  (Dkts. 22, 29, 33.)

## I.   BACKGROUND

The Motion seeks suppression of evidence seized during an October 12, 2022 search of Pineda's residence.  (Dkt. 16 at 1.)  When he filed the Motion, Pineda acknowledged that the Government had produced several copies of a warrant for the search of his residence, but argued that it was "difficult to ascertain" which authorized the search at issue given that the production constituted seven different copies of warrants approved by three judges on three different dates (September 16, 2022; October 6, 2022;

and October 12, 2022).  (*Id.* at 1-2.)  Pineda further argued that the items "seized during the execution of the search" should be suppressed because "none of the various warrants authorized the searching agents to search for or seize any evidence in the locations where the contraband supposedly was discovered ('In the woods behind the residence')" and that "indeed, there is no proof that the woods behind the residence were even located within the exterior boundaries of the Defendant's residential property."  (*Id.*)

The Government responded in its pre-July 19 hearing opposition that the Motion raised only legal questions with no factual issues; no genuine dispute existed that the October 6, 2022 search warrant applied and authorized a search of Pineda's residence "and the curtilage therein," which was inclusive of the "woods" where the two water coolers were found; and regardless of whether the October 6, 2022 search warrant authorized a search of the "woods," the open fields doctrine applies to the search and "allowed officers to search and find the coolers" "because if the woods were beyond the house's curtilage, they were open fields" and did not require a warrant prior to a search. (Dkt. 20 at 1-4.)  The Government also asserted that Pineda did not argue that he had a reasonable expectation of privacy in the items seized and that, if the "woods" were not part of the property, he had no Fourth Amendment standing to suppress the evidence found in the coolers.  (*Id.* at 4-5.)  The Government maintained these arguments at the July 19 hearing and did not present any witnesses.

At the July 19 hearing, the Court admitted without objection Defendant's Exhibits 1 and 2 and Government Exhibit 1.  After that hearing, on August 2, 2023, Pineda filed a supplemental brief in support of the Motion.  (Dkt. 24.)  The Government filed a

supplemental opposition on August 16, 2023.  (Dkt. 25.)  Pineda again argued in his supplemental brief that the October 6, 2022 warrant did not authorize the search and seizure at issue.  (Dkt. 24 at 1-3.)  Pineda also argued that the open fields doctrine is inapplicable and that he had a reasonable expectation of privacy in the search "of the closed and concealed coolers" found "on his own property."  (*Id.* at 3-6.)  In its supplemental opposition, the Government argued that the Motion should be denied because Pineda waived arguments relating to the open fields doctrine, particularly his argument that he had a reasonable expectation of privacy in the contents of the coolers as those arguments were not made in his initial Motion.  (Dkt. 25 at 1, 6-8.)  The Government asserted that if the "new" argument in Pineda's supplemental brief was considered, "a second hearing should be held, where the government would call an officer to testify as to the location of the first cooler" because the argument raised "a new fact issue—not ripe until now—as to whether one of the coolers was found in the curtilage, where the warrant authorized a search."  (*Id.* at 2, 7.)

Because the parties' submissions, including the exhibits, raised certain factual issues and disputes, including where the two coolers at issue were located (*see* Def.'s Ex. 1 at 6; *see also* Def.'s Ex. 2 (officers' reports where they refer generally to a cooler found "in the woods")), the Court reopened the hearing on the Motion (Dkts. 26-27).  The reopened hearing began on October 4, 2023 (Dkt. 29) and was continued to October 6, 2023 (Dkt. 33).

The Court received testimony during the October 6, reopened hearing.  (*See* Dkt. 35.)  The Government called two witnesses, Agent Jeff Fischbach, who found the first

water cooler (Dkt. 35 at 4:6-38:16), and Officer Alex Godfrey, who found the second water cooler (*id.* at 39:10-67:14)[1].  Pineda called private investigator William O'Keefe as a witness (Dkt. 35 at 68:13-77:16) and Pineda testified pursuant to *Simmons v. United States*[2] (*id.* at 77:19-80:9).  The Government submitted five exhibits and Pineda submitted three exhibits, all of which were received by the Court.  (*See id*. at 2.)

Agent Fischbach testified as follows during the October 6 reopened hearing.  The property where the water coolers were found had a lawn and a wooded area beyond. (Dkt. 35 at 13:1-5.)  Officers found a shed on the lawn which was adjacent to the house, and it appeared to have been used as a shelter to convert liquid methamphetamine "back into a crystal-like substance."  (*Id*. at 13:23-25.)  Officers had expected to find large quantities of methamphetamine on the property after buying large amounts of the drug through controlled purchases, but they found none in the shed.  (*Id*. at 15:8-14.) However, methamphetamine residue was found on items such as pots and pans in the shed.  (*Id*. at 14:6-12.)  While in the shed, Agent Fischbach noticed "several shovels" and thought that the quantity of shovels was "more than most people have."  (*Id*. at 15:15-22.) The officers took a shovel "to see if [they] could find any areas that were dug up or freshly dug up."  (*Id*. at 15:24-25, 16:1.)

Agent Fischbach noticed an area that "just seemed off and not right for that area of the yard."  (*Id*. at 16:11-12.)  It seemed off because of "logs/wood that were around a

---

[1]    Citations to transcripts are in page:line format.

[2]    390 U.S. 377 (1968).

piece of black plastic right in the middle of the yard right where the wood starts." (*Id*. at 16:14-16.)  The way the logs were positioned and because there were leaves on the ground, but "really no leaves on the plastic," made it "look off" and not "normal" to Agent Fischbach.  (*Id*. at 16:18-21.)  Agent Fischbach then "slammed" the head of the shovel in the middle of the plastic and heard a "loud noise" which did not sound like the shovel hitting something "that should be out in the woods."  (*Id*. at 16:23-25, 17:3-10.) Agent Fischbach removed the plastic and found an "orange-and-white water cooler" buried in the ground.  (*Id*. at 17:12-15.)   Upon opening the cooler, Agent Fischbach found "several bags" of suspected methamphetamine, which looked exactly like the methamphetamine purchased through the controlled buys—"a wet, long crystal-like substance that was stained kind of a brownish color."  (*Id*. at 18:3-25, 19:1.)

Agent Fischbach did not see any "keep out" signs or information identifying who the plastic or water cooler belonged to, and there was no lock on the cooler.  (*Id*. at 19: 4-15.)  Agent Fischbach testified that he found the first water cooler "right where the woodline met the grassy area of the yard," approximately 10-15 yards from the shed.  (*Id*. at 20:1-9.)  But he acknowledged that his report and the chain-of-evidence report stated that both water coolers were found "in the woods."  (*Id*. at 32:22-25, 35:14-22.)  Agent Fischbach then described a "defining line between the yard and woods" and testified that the first water cooler was "on the yard side" of that line.  (*Id*. at 38:1-8.)

Officer Godfrey testified as follows during the October 6 reopened hearing. Officer Godfrey arrived at the residence and searched the downstairs level of the house. (*Id*. at 44:1-12.)  The residence appeared "very bare" to Officer Godfrey, with no

furniture and like no one "had been living there." (*Id*. at 51:11-16.) Officer Godfrey then searched the garage, and found a car with worn tires, "eight extra tires and rims," a chain saw, radiator fluid, and engine oil. (*Id*. at 45:5-25.) He searched the car and found gas station receipts, old food, garbage, and a small floor jack used to change tires. (*Id*. at 44:25, 45:1-2.) Based on Officer Godfrey's experience and training on "some of the indications" for "vehicle interdiction and drug trafficking," he thought that what he found was significant because it was consistent with "drug trafficking activity." (*Id*. at 46:12-25, 47:1-8.) He testified that based on his training, trash and receipts showed that a person has been "traveling over a long distance"; engine oil, extra fluids and car parts, and a jack are kept in case of a breakdown; and the presence of many tires enabled a person to quickly change their tires when the tires wore out and continue on their way. (*Id*. at 46:21-25, 47:1-5.) Officer Godfrey then when down to the shed and learned that pots and pans had been found there, along with multiple shovels and black plastic bags. (*Id*. at 47:10-24, 48:5-6.) Officer Godfrey learned that the first cooler was found buried in the ground "in close proximity to the shed." (*Id*. at 48:8-10.) Based on finding the first cooler buried in the ground, the presence of shovels and gardening tools when the residence was otherwise "very bare," and small brush piles or logs located throughout the property rather than one brush pile for removal or burning, Officer Godfrey decided to continue searching the property for more "buried items." (*Id*. at 50:17-25, 51:1-22.)

He then began searching along a "small foot path trail going to the south up the hill" on the property into the wooded backyard. (*Id*. at 48:15-19.) While on the path, Officer Godfrey saw several logs on a plateau, placed in a "U-shape," and a small brush

pile on top, which he thought was about 20 to 30 feet from the first cooler and about 40 to 50 from the residence. (*Id*. at 52:1-24, 53:2-5.) Officer Godfrey followed a small foot path to the brush pile and removed it, noticing black plastic underneath. (*Id*. at 54:10-21.) He did not see any "keep out" signs, any identifying information, or a lock on or near the brush pile or black plastic. (*Id*. at 54:22-25, 55:1-10.)

After alerting other officers to what he found, Officer Godfrey watched other officers remove the black plastic to find the second water cooler underneath. (*Id*. at 56:5-8.) The officers unscrewed the cooler lid and found what appeared to be methamphetamine within. (*Id.* at 56:15-25.) The black plastic over the place where Officer Godfrey found the second cooler "appeared to be similar" to the black plastic found in the shed, and no other similar plastic was found on the property other than over the two water coolers and in the shed. (*Id*. at 55:15-25.) Officer Godfrey did not see any identifying information or a lock on the water cooler. (*Id*. at 56:9-14.)

Both Agent Fischbach and Officer Godfrey testified about the Government's exhibits. (*Id*. at 20-23, 57-62.) The officers testified that Government Exhibit 1 is an aerial property map of the residence, which Agent Fischbach got from the "tax assessor's site," and which included markings placed by Agent Fischbach indicating the locations of the water coolers. (*Id*. at 20:13-25, 21:1-9, 57:24.) The officers testified that Government Exhibit 2 is a picture taken before the search warrant was executed showing the residence and the shed, where Agent Fischbach had added markings indicating the locations of the water coolers. (*Id*. at 21:17-25, 22:1-10, 59:1-19.) Government Exhibit 3, according to the officers, is a picture of the side of the shed and the area where the first

water cooler was found, with a marking placed by Agent Fischbach indicating as such. (*Id.* at 22:11-25, 23:1-6, 59:20-25, 60:1-17.)  While discussing Government Exhibit 3, Officer Godfrey testified that although he did not find the first water cooler, he did see "the hole where it had been buried" and stated that he considered that area of the first water cooler "the yard" whereas he considered the area of the second water cooler "the woods."  (*Id.* at 60:9-17.)  The officers testified that Government Exhibit 4 is a picture of the area where the second water cooler was found and included the logs, black plastic, and top of the buried water cooler (*id.* at 23:7-16, 60:18-25, 61:1-8) and Government Exhibit 5 is a picture of the second water cooler with the bags of methamphetamine visible (*id.* at 23:17-22, 61:9-19).  Agent Fischbach also identified Defendant's Exhibit 1 as a 3-page document constituting three photographs of the area where he found the first water cooler.  (*Id.* at 23:23-25, 24:1-25.)

Private Investigator O'Keefe testified as follows during the October 6 hearing. Mr. O'Keefe visited the property with Pineda's attorney the day before.  (*Id.* at 69:16-21.) Pineda's attorney took photos of the area where the first water cooler was found while Mr. O'Keefe stood next to him.  (*Id.* at 69:22-25, 75:2-6.)  These photos were submitted as exhibits.  (*Id.* at 70:5-15.)  Mr. O'Keefe was able to determine the location of the hole made by the first water cooler by looking at the Government's exhibits prior to arriving at the property and talking with the owner.  (*Id.* at 70:21-25, 71:1-8.)  However, the owner did not tell Mr. O'Keefe how she knew where the hole was.  (*Id.* at 74:1-3.)  Mr. O'Keefe testified that even though "it's a little difficult this time of year," he could visually determine a line between the lawn and the woods based on the lawn that would be cut

(the yard) and the lawn that would not be cut (the woods), and the hole was "on the wood[s] side" of that line.  (*Id*. at 72:13-25.)

Pineda testified as follows.  Pineda dug the holes in the ground for the coolers "in the woods" because he was "scared and [he] didn't want anybody to see them."  (*Id*. at 78:18-25, 79:1-5.)  He was worried that the owner of the home would see the coolers or that "other people could steal" them, so he took "measures to conceal" them and "put them in the woods."  (*Id*. at 79:6-12.)

After the hearing, the parties were given the opportunity to file post-hearing briefs.  (Dkt. 33.)  Pineda declined to do so in an October 27, 2023 letter stating that the previously filed briefs and oral argument were sufficient.  (Dkt. 37.)  The Government filed a post-hearing brief on November 2, 2023.  (Dkt. 39.)  The Court now considers the parties' respective arguments.

## II.    ANALYSIS

As discussed, Pineda originally argued in the Motion that there was no valid warrant to justify the search and seizure, or in the alternative, that if a valid warrant existed, the warrant did not authorize the government to search "the woods behind the residence."  (Dkt. 16 at 1-2.)  The Government attached an October 6, 2022 search warrant (received as an exhibit at the July 19 hearing) to its pre-July 19 hearing opposition, in which the Government argued that the warrant justified the search of the property and the open fields doctrine authorized the search of the woods and the seizure of the water coolers.  (Dkt. 20 at 2-4, 20-1 at 6-11.)  The October 6 warrant authorized

the search of a single-family residence, the residence's curtilage, and three vehicles.[3]
(Dkt. 20-1 at 8.)  The Government also argued that Pineda did not assert standing and had
no reasonable expectation of privacy.  (*Id*.)

In Pineda's supplemental brief filed on August 2, he argued that the search and
seizure at issue was not authorized by the October 6 warrant, the open fields doctrine
does not justify the search, and he had a legitimate expectation of privacy in the search of
the water coolers.  (Dkt. 24 at 1-4.)  The Government then countered in its supplemental
opposition that Pineda waived these arguments by not raising them in his initial brief.
(Dkt. 25 at 8.)  The Government also argued that Pineda did not have a legitimate
expectation of privacy in the water coolers, and as an alternative, that the first water
cooler was found within the curtilage of the yard and therefore the search and seizure of
that cooler was authorized by the warrant.  (Dkt. 25 at 9-17.)

---

[3]    Specifically:

8XXX Eagle Creek Blvd, City of Shakopee, County of Scott, State of
Minnesota, 55379. Further described as a single-family residence, with a tuck
under garage, brick facade, gray/green siding with white/light trim, and the
curtilage therein. Residence is clearly marked 8XXX at the end of the long
driveway.

2007 White in color Hummer H3 Sport bearing Minnesota License Plate
7AX322, VIN: XXXXXXXXXXXXXX909.

2015 Dark in color Dodge Charger bearing Minnesota License Plate
GMG649, VIN: XXXXXXXXXXXXXX308.

2002 Silver in color Honda Civic Couope [sic] bearing Minnesota License
Plate ECF485, VIN:XXXXXXXXXXXXX520.

(Dkt. 20-1 at 8.)

The Court will address the waiver argument first.  The Court will next address the factual issue of where the first water cooler was located and then address the open fields doctrine arguments.

**A.    Waiver**

The Government argued in its supplemental opposition that Pineda waived any arguments about the authority to search and seize the water coolers because the Motion simply argued that no warrant authorized the search, and that this issue was addressed when the October 6 warrant was established as the authority for the search and seizure. (Dkt. 20 at 8.)  The Government relies on Federal Rule of Criminal Procedure 47(b) (stating "[a] motion must state the grounds on which it is based") and Local Rule 12.1(c)(1)(B) (stating "[t]o the extent practicable, a motion . . . to suppress evidence must identify that evidence and the nature of the challenge") when arguing that Pineda waived his authority arguments.

The Court is not persuaded by this argument.  First, the Government failed to acknowledge Pineda's alternative argument in the Motion where he stated, "Regardless of which version was a valid warrant (if any), none of them permitted a search of 'the woods behind the residence'—indeed, there is no proof that the woods behind the residence were even located within the exterior boundaries of the Defendant's residential property." (Dkt. 16 at 2.)  Thus, Pineda raised the question of the authority to search the woods behind the residence in the Motion.  Second, the Government discussed the open fields doctrine, whether Pineda had standing to challenge a search of the woods if they were not part of Pineda's property, and whether Pineda had a reasonable expectation of

privacy in the contents of the coolers its pre-July 19 hearing opposition.  (Dkt. 20 at 2-5.)
Under these circumstances, the Court will permit Pineda to respond to those arguments
and clarify his position, as is contemplated by Local Rule 12.1(c)(1)(B) (stating that a
motion to suppress evidence must identify the nature of the challenge "[t]o the extent
practicable").  Here, Pineda identified the nature of the challenge to the extent practicable
in his Motion and clarified his position in subsequent filings and arguments before the
Court.  The Court therefore concludes that Pineda did not waive the open fields doctrine
arguments.

**B.      Location of the First Water Cooler**

The Government's initial position appeared to be that both water coolers were
found "in the woods."  (*See* Dkt. 20 at 2 ("In the woods, officers found two orange water
coolers partially buried in the ground, with the lids protruding above ground.").)  At the
July 19 hearing, Pineda submitted two exhibits, one where the reporting officer stated:
"Agent Fischbach began looking in the wooded tree line area of the residence's backyard.
After observing and removing a piece of black plastic which appeared to be out of the
ordinary, he alerted us to what appeared to be a buried cooler."  (Def.'s Ex 1 at 6 (July
19 hearing).)  Another report, authored by Officer Godfrey, stated, "a short time later, I
was notified of a large orange water cooler that was located in the woods behind the
residence."  (Def.'s Ex. 2 at 4 (July 19 hearing).)

In his August 2 supplemental brief, Pineda maintained his argument that the
warrant did not authorize a search of the woods, argued that both water coolers were
found within his property lines and that the open fields doctrine did not authorize a search

of the water coolers because they were not in plain view, and argued that he had a reasonable expectation of privacy in the water coolers.  (Dkt. 24 at 2-6.)  In its August 16 supplemental opposition, the Government countered these arguments (including based on exhibits to the brief later authenticated at the October 6 reopened hearing) and made an alternative argument that the first water cooler was found within the curtilage of Pineda's property and therefore authorized by the October 6 warrant.  (Dkt. 25 at 16-17; *see also* Dkts. 25-1 to 3 (photos of coolers).)  After reviewing this supplemental briefing, the Court reopened the hearing to receive evidence as to a number of factual issues and disputes, including as to the location of the water coolers.  (Dkt. 26.)

The Government acknowledges that Agent Fischbach's testimony conflicts with Mr. O'Keefe and Pineda's testimony.  But the Government argues that Agent Fischbach's testimony, as the person who found the first water cooler, should be deemed more credible than the others, who did not conduct the search.  (Dkt. 39 at 3.)  The Court agrees.

Agent Fischbach's testimony aligns with the location of the first water cooler in the Government Exhibits 1-3 from the second hearing.  (Gov.'t Ex. 1-3 (October 6 hearing); *see also* Dkts. 25-1 to 3 (unauthenticated copied of exhibits).)  Agent Fischbach described a line between the yard and the woods and testified that the first water cooler was found on the yard side of that line.  (Dkt. 35 at 37:23-38:8.)  This is consistent with the location of the first water cooler shown in Government Exhibit 3.  (Gov.'t Ex. 3 (October 6 hearing).)  Moreover, Officer Godfrey testified that on the day of the search, he saw the hole where the first water cooler had been found and considered the hole to be

in "the yard," in contrast to the area where he found the second water cooler, which he considered "the woods."  (Dkt. 35 at 60:9-17.)  Mr. O'Keefe's testimony about the first water cooler's location was based on his review of the Government's photographs and on the owner's showing him where the hole was located a year after the search and after the owner filled in the hole.  (Dkt. 35 at 70:18-72:12.)  The Court therefore finds Mr. O'Keefe's testimony less persuasive than the contemporaneous photos of the site and the testimony of Agent Fischbach and Officer Godfrey.  Further, the photos in Pineda's exhibits were taken almost a year after the search in question, from the vantage point of looking into the woods from the lawn, and apparently at or near the tree line as of 2023.  (*Id.* at 75:20-77:3; *see also* Def.'s Exs. 1-3 (October 6 hearing).)  This perspective does not provide much help to the Court in determining whether the first water cooler was located in the yard or the woods.  Based on the record, the Court concludes that the first water cooler was located within the curtilage of the property and that its search was authorized by the October 6 warrant.

## C.    Open Fields Doctrine

The Court turns to the parties' arguments as to the open fields doctrine and its application to the second water cooler, which the parties agree was found in the woods.[4]

The Fourth Amendment guarantees the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S.

---

[4]    Although the Court has concluded that the first water cooler was located within the curtilage, the same analysis would apply to that water cooler if, as Pineda argues, it was located in the woods.  As the same analysis applies to both coolers if found in the woods, the Court refers to "water coolers" in Section II.C.

14

Const. Amend. IV.  However, the "open fields" surrounding a "house" are not listed among the Fourth Amendment's protected areas.  *United States v. Castleman*, 795 F.3d 904, 913 (8th Cir. 2015) (stating the Fourth Amendment's list of protected areas does "not 'extend to the open fields'" (quoting *Oliver v. United States,* 466 U.S. 170, 176 (1984))); *see also Oliver*, 466 U.S. at 176 ("The distinction between [open fields] and the house is as old as the common law." (quoting *Hester v. United States*, 265 U.S. 57, 59 (1924))).  Thus, "the government's intrusion upon an open field" is not a "search in the constitutional sense," and does not by itself trigger the Fourth Amendment's reasonableness requirement.  *Oliver*, 466 U.S. at 177, 183.  "[T]he Fourth Amendment concept of an 'open field' includes 'any unoccupied or undeveloped area outside of the curtilage,' even if protected by a dense wood."  *United States v. Pennington*, 287 F.3d 739, 745 (8th Cir. 2002) (quoting *Oliver*, 466 U.S. at 180 n.11).

"Individuals have 'no legitimate expectation that open fields will remain free from warrantless intrusion by government officers.'"  *Castleman*, 795 F.3d at 913 (quoting *Oliver*, 466 U.S. at 176).  "Police officers . . . may 'enter and search an open field without a warrant.'"  *Id*. (quoting *Oliver*, 466 U.S. at 173).  However, the Fourth Amendment can apply to the search of an object or item left in an open field if the person has a legitimate expectation of privacy in the item.  *Id*.  A legitimate expectation of privacy is established when the two *Katz* requirements are met—the person must (i) "assert[] a subjective expectation of privacy" in the item, and (ii) that "subjective expectation" of privacy must be "objectively reasonable."  *United States v. Stallings*, 28 F.3d 58, 60 (8th Cir. 1994) (quoting *United States v. Kiser*, 948 F.2d 418, 423 (8th Cir. 1991), and *Katz v. United*

*States*, 389 U.S. 347, 351 (1967)); *see also Castleman*, 795 F.3d at 913 ("Castleman must have had a subjective expectation of privacy in these containers which was objectively reasonable.").  It is Pineda's burden to prove these elements.  *See Stallings*, 28 F.3d at 60 ("The defendant moving to suppress has the burden of proving a reasonable expectation of privacy in the [item] searched." (quoting *United States v. Gomez*, 16 F.3d 254, 256 (8th Cir. 1994))).

Pineda does not appear to dispute that the woods at issue constitute "open fields." Instead, quoting *Pennington* for the proposition that "the open fields doctrine only allows a search of what is in plain view in the open field" and "does not justify a warrantless search of a man-made enclosure found in an open field," Pineda argues that the open fields doctrine does not justify the search and seizure of the water coolers because they were covered by brush and plastic (not in plain view) and he had a legitimate expectation of privacy in the "closed and concealed coolers." (Dkt. 24 at 3-5 (quoting *Pennington*, 287 F.3d at 745).)

The Government does not argue that the coolers themselves were in plain view. However, the Government contends that "any item seen in plain view can in turn be searched without triggering the Fourth Amendment's protections unless someone has a reasonable expectation of privacy over the item."  (Dkt. 25 at 15-16.)  The Government argues (and Pineda does not dispute) that he had no such expectation in the brush and plastic covering the water coolers, permitting law enforcement to remove that material and see the water coolers without triggering a Fourth Amendment search.  (*Id.* at 16-17.) Finally, the Government argues that Pineda has not shown either a subjective expectation

of privacy or a reasonable expectation of privacy in the water coolers.  (Dkt. 25 at 11-15.)
The lawfulness of the search of the water coolers therefore depends on whether Pineda
has shown he had both a subjective expectation of privacy and a reasonable expectation
of privacy in the water coolers.

Pineda argues that he meets the first *Katz* requirement that he asserted a subjective
expectation of privacy in the water coolers.  (Dkt. 24 at 5.)  "To meet the first part of the
test, [Pineda] must demonstrate that by his conduct, he sought to preserve the [concealed
jugs] as private."  *Stallings*, 28 F.3d at 60.  The Eighth Circuit has identified five factors
relevant to that determination: (1) was the item "left . . . in an open field"; (2) was there
"indicia of . . . ownership" of the item; (3) was there "evidence of . . . possession or
control" of the item; (4) was there evidence of "historical use" of the item; and (5) was
there evidence of the defendant's "ability or attempts to regulate access to" the item.  *Id.*
at 60-61.

Here, Pineda argues that he "completely hid[]" the water coolers

> from the view of *any* person by completely burying them on his own
> property, by placing black plastic and brush over the location where they
> were buried, and by burying them on a section of his property that could only
> be accessed by first crossing over the private lawn behind his house.

(Dkt. 24 at 4-5.)  Before the Court reopened the hearing, the Government's supplemental
opposition argued that consideration of the five relevant factors demonstrates that Pineda
did not have a subjective expectation of privacy.  (Dkt. 25 at 11-12.)

As to Pineda's intent, he testified that he dug the holes for the water coolers in the
woods of the property and hid the water coolers in those holes because he did not want

17

anyone (including the property owner) to see them or steal them.  (Dkt. 35 at 78:18-25, 79:1-5.)  Moreover, it is undisputed that the water coolers were covered in brush and plastic.  This constitutes evidence as to Pineda's possession or control of the item and, to some extent, attempts to regulate access to the water coolers by burying them in holes and covering them up.  However, it is undisputed that the water coolers lacked any indicia of ownership and had no locks or "keep out" signs on them.  (*See id.* at 79:20-80:3.)  Finally, while the warrant described the property as Pineda's "residence" (*see generally* Dkt. 20-1), he testified about his concern that the property owner would find the water coolers, suggesting he did not have the ability or right to preclude the owner from entering the woods.  (Dkt. 35 at 71:5-8, 79:7-8.)  Under these circumstances, it is a close call as to whether Pineda had a subjective expectation of privacy in the buried water coolers.  For purposes of this Report and Recommendation, the Court assumes he has shown a subjective expectation of privacy and turns to whether any such expectation was objectively reasonable.  *See Castleman*, 795 F.3d at 913 ("Assuming that Castleman had a subjective expectation of privacy, the district court determined that this expectation was not objectively reasonable.").

The Government highlights three "guiding cases" with respect to the objective reasonableness of any such expectation of privacy, namely *Stallings*, *Castleman*, and *Pennington*.  (Dkt. 25 at 13-14.)  In *Stallings*, officers found and opened a tote bag that was "zipped shut" and hidden in an open field adjacent to the defendant's property, which he "neither owned nor leased," under "thick underbrush" where the bag seemed "out of place."  28 F.3d at 59.  The Eighth Circuit "agree[d] with [the defendant] that the

'open field doctrine' [wa]s not completely dispositive in this case because the real question [wa]s not the officers' authority to be upon and search the field but instead their authority to search the zipped tote bag," but explained that "the fact that the bag was left in an open field owned by another is highly relevant, as a factual matter, in demonstrating the reasonableness of his expectation of privacy. *Id.* at 61 n.3. The *Stallings* court concluded that the defendant lacked an objective expectation of privacy in the tote's contents because it was "left unattended in an open field in which [the defendant] had no possessory interest with no apparent means of restricting access to it," where an "animal" or another "person" could have discovered it. *Id*. at 61. In so holding, the Eighth Circuit noted: "We have held that even the 'theoretical possibility' that 'animals, children, scavengers, snoops, and other members of the public' would happen onto an item was sufficient to make a defendant's expectation of privacy unreasonable." *Id.* (quoting *Wabun-Inini v. Sessions*, 900 F.2d 1234, 1242 (8th Cir.1990)).

In *Pennington*, officers searched for methamphetamine in a residence and an adjacent "box trailer" on the defendant's large "rural" property pursuant to a warrant. 287 F.3d at 741, 743-44. In a field "nearly three hundred yards from the modular home," and "away from the box trailer," officers found "a ventilation pipe protruding from the ground" and a "wooden pallet covering an entryway." *Id*. at 754. A ladder extended from the entryway to a tunnel that in turn led to an "underground bunker." *Id*. The bunker was "not visible from the surface, but there was no lock or door protecting the entryway, and the officers did not see a 'no trespassing' sign in the area." *Id*. Officers looked in the bunker, even though it was not included in the warrant. *Id*. Although it

was "a very close issue," the Eighth Circuit found no objective expectation of privacy in the contents of the bunker given the bunker's location in an "open field," its "readily visible entryway with an unprotected ladder facilitating access," and the lack of a "lock or door impeding access." *Id*. at 746.

In *Castleman*, officers executed a warrant at the defendant's residence, which was on hundreds of acres of property. 795 F.3d at 908. The defendant "owned the property and controlled access to it via a locked gate, fences, and signs posted at the boundaries." *Id*. at 913. Officers "followed a driveway . . . away from the residence" to "an area not visible from the house," where "they found closed garbage bags in a trailer" and a "plastic tote" that was placed under a "tarp" and visible without moving the tarp. *Id*. at 908. Officers looked inside the garbage bags and the tote, even though the area in which they were found was not included in the warrant. *Id*. The *Castleman* court concluded that the defendant lacked an objective expectation of privacy because the items were in the "open field," where "people could have come across" them. *Id*. at 914. Moreover, the trash bags and tote "bore no indicia of ownership." *Id*. Not even the locked gate, fences, and signs surrounding the property were enough to create an objective expectation of privacy in the open field. *Id*.

Here, the water coolers bore no indicia of Pineda's ownership, had no locks, and were not labeled with "keep out" or any other words indicating they should not be opened. Further, the Eighth Circuit has concluded that "[p]roperty ownership and efforts to control access to the area are not enough to create an objectively reasonable expectation of privacy in open fields." *Castleman*, 795 F.3d at 914. Here, Pineda's non-

owning resident status weighs less in favor of an objectively reasonable expectation of

privacy than the ownership asserted in *Castleman*, and there is no evidence of his efforts

or ability to control access to the area. Indeed, Pineda testified as to his concerns that the

property owner or others would find the coolers, suggesting he had "no apparent means

of restricting access" to their location. *See Stallings*, 28 F.3d at 61. This weighs against

finding Pineda had a reasonable expectation of privacy in the coolers' contents. And

while Pineda focuses on his attempts to conceal the water coolers, "as the Supreme Court

held in *Oliver v. United States*, the fact that a person attempts to conceal something from

the public eye does not establish a reasonable expectation of privacy in the constitutional

sense." *United States v. Douglas*, No. 11-CR-0324 PJS/LIB, 2012 WL 87717, at *3 (D.

Minn. Jan. 11, 2012), *aff'd*, 744 F.3d 1065 (8th Cir. 2014) (citing *Oliver*, 466 U.S. at 182-

83). The water coolers were covered by nothing more than brush and black plastic. (Dkt.

35 at 16:14-17:15, 29:6-30:16, 54:12-21, 56:3-8.) Moreover, Officer Godfrey testified

that his attention was drawn to the location of the second water cooler because "the logs

liked [sic] they had been placed in a U-shape to either blend into the hillside or stop

someone from seeing up the hill what was underneath the brush pile, and then the brush

pile was directly kind of on top of the logs" (Dkt. 35 at 54:12-16) and Agent Fischbach

testified that the first water cooler was covered by partially visible black plastic and

surrounded by "dimensional wood" (*id.* at 29:6-30:2). These attempts to conceal the

water coolers are analogous to the "readily visible" entryway of *Pennington*, which was

covered by a wooden pallet and next to a ventilation pipe. 287 F.3d at 745. Under these

circumstances, the Court concludes that Pineda has not shown he had a reasonable

expectation of privacy in the contents of the coolers.  Indeed, there was at least a "theoretical possibility" that others—including the property owner—would find the water coolers, rendering any "expectation of privacy unreasonable." *See Stallings*, 28 F.3d at 61.  Consequently, the Court recommends denial of the Motion because Pineda has not shown he had a reasonable expectation of privacy in the coolers' contents.

***

For the reasons stated above, the Court recommends that Pineda's Motion to Suppress All Evidence Obtained from Unlawful Searches and Seizures (Dkt. 16) be denied.

### III.    RECOMMENDATION

Accordingly, based on the files, records, and proceedings herein, **IT IS RECOMMENDED** that Pineda's Motion to Suppress (Dkt. 16) be **DENIED**.


DATED:  December 4, 2023                    *s/Elizabeth Cowan Wright*
                                            ELIZABETH COWAN WRIGHT
                                            United States Magistrate Judge


**NOTICE**

This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under District of Minnesota Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation.  A party may respond to those objections within 14 days after being served a copy of the objections.  D. Minn. LR 72.2(b)(2).  All objections and responses must comply with the word or line limits set for in D. Minn. LR 72.2(c).